## FAHRENWALD v. OHIO STEEL FOUNDRY CO.

(Circuit Court of Appeals, Sixth Circuit. January 11, 1927.)

No. 4637.

1. **Master and servant** ⬗═⇒8(1)—Contract held one for expert's services, terminable at will by either party.

A contract between plaintiff, an expert in the manufacture of chromium heat-resisting alloys, and defendant, a manufacturer of castings, by which plaintiff engaged to work with defendant, "to the end that a business in these high-temperature resisting alloys can be built up in as profitable fashion as possible," and was to receive 5 per cent. of total sales "of all future business, in return for his technical assistance and services," *held* a contract of employment terminable at will by either party, and plaintiff *held* entitled to a percentage of sales in the business only so long as the contract relation continued.

2. **Master and servant** ⬗═⇒8(1)—Contract for services is terminable at will, in absence of other provision.

In the absence of provision otherwise, express or implied, a contract for services is terminable at will by either party.

In Error to the District Court of the United States for the Western Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Action at law by F. A. Fahrenwald against the Ohio Steel Foundry Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Harold Elno Smith and Rufus S. Day, both of Cleveland, Ohio (Day & Day, of Cleveland, Ohio, on the brief), for plaintiff in error.

J. H. Goeke, of Lima, Ohio (Parmenter & Reid, of Lima, Ohio, on the brief), for defendant in error.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This writ is to review the action of the District Court in sustaining demurrer to plaintiff's petition, and accordingly dismissing the suit. The petition may be thus sufficiently summarized:

[1] Plaintiff is a consulting metallurgical engineer, located at Cleveland, Ohio, and had built up and owned a personal business and good will in the manufacture and sale of certain chromium containing alloys for high-temperature heat-resisting processes and certain chemical uses, which alloys had been developed by plaintiff and had been by him perfected for various technical purposes, and which enjoyed a high esteem among purchasers of such materials by reason of plaintiff's experience in and knowledge of such alloys. Defendant was engaged in the business of making and selling castings and was equipped with electric furnaces and other appliances for the manufacture of plaintiff's special alloys, but had never manufactured or sold such alloys. Previous to and immediately preceding the making of the contract here sued upon defendant had solicited plaintiff to turn over to it his business of making and selling such alloys, and to assist defendant in undertaking such business and building up for itself a lucrative business therein. The parties accordingly entered into a written contract, which we print in the margin.[1] When the contract was made plaintiff had on hand numerous orders for alloys and alloy castings, such as are referred to in the written agreement which had been submitted to him by different concerns in the trade, and on which quick delivery was desired. Plaintiff immediately turned these orders over to defendant, and had patterns made at defendant's plant under plaintiff's supervision and delivered to its electric furnace department, instructed defendant's purchasing agent what raw materials should be ordered in the way of various substances, in preparation for starting business under the agreement, and on the readiness of the patterns and receipt of the raw materials personally instructed defendant's workmen how molds should be made and electric furnaces charged and operated, what slags and fluxes should be used and what temperatures should be maintained, with instructions how to clean the castings to meet the requirements of the trade and inspection, defendant and its employees being then ignorant of all these procedures, having never before employed chromium and heat-resisting alloys. That for many following months practically all orders were obtained by plaintiff while traveling about the country at his own expense, visiting his former customers and friends in different cities, plaintiff afterwards personally supervising the making of the required special patterns and supervising the compounding and melting and pouring of the alloys, and even instructing the purchaser as to its use. That in course of time plaintiff gradually instructed and selected a crew of salesmen, and also brought to defendant three of his own former associates in an electric alloys company, who had been trained by plaintiff in the properties, requirements, capabilities, uses, sales, and arguments of Fahrenwald's high-temperature alloys, these three salesmen being still connected with defendant and being its principal representatives in the East.[2]

The relations between plaintiff and defendant provided for by the contract continued from about July 31, 1922, until December 1, 1924, when defendant assumed to terminate the contract as of the latter date, refusing and failing to pay any further commissions to plaintiff, although itself continuing in the business of producing and selling Fahrenwald's heat-resisting alloys. It is not alleged that plaintiff performed any services for defendant after December 1, 1924, and no damages are sought except as resulting from the alleged termination of the contract. The correctness of the District Court's action depends

---

"[1] The Ohio Steel Foundry Company.

"Lima, Ohio, July 31, 1922.

"Memorandum of agreement between Dr. F. A. Fahrenwald and the Ohio Steel Foundry Company covering manufacture and sale of various heat-resisting alloys:

"It is understood that Dr. Fahrenwald is to work with the Ohio Steel Foundry Company, giving them the benefit of his technical knowledge and commercial ability *to the end that a business in these high-temperature resisting alloys can be built up in as profitable a fashion as possible.*

"It is understood that the Ohio Steel Foundry Company is to *give Dr. Fahrenwald the entire profit* represented by the difference between the cost and the sales price up to an amount of $1,000 per month for the first six months' period; unless 5 per cent. of the total sales should amount to more than $1,000 per month. In that event, he is to receive 5 per cent. of the total sales. It is understood that Dr. Fahrenwald is to receive 5 per cent. of all future business in return for his technical assistance and services.

"It is further understood that the selling price of any of these alloys as manufactured by the Ohio Steel Foundry Company must be mutually agreed upon by Dr. Fahrenwald and the Ohio Steel Foundry Company."

(Italics ours.)

[2] We omit certain other detailed narrative statements relating to the method pursued in carrying out the contract as immaterial to the issues involved here.

solely upon whether defendant had the right, under the written contract, at its own will, to terminate the contract relations when it did, or whether, as plaintiff contends, defendant was bound to pay plaintiff the commissions provided by the contract so long as defendant should continue in the business of making and selling high-temperature heat-resisting alloys.

[2] We think the demurrer was rightly sustained. To our minds the contract was solely for plaintiff's personal services. Indeed, this seems conceded. He was to "work with defendant." It is not alleged that plaintiff furnished to defendant, nor that he in fact had, any patented or secret processes of manufacture. His knowledge of and experience with such processes, with the art of selling and his favorable acquaintance with the trade and the orders on hand, affected only the desirability to defendant of plaintiff's personal services. The contract contains no express statement as to term of employment. In the absence of contract provision, express or implied, either party would have the right to terminate the arrangement at will.

Plaintiff contends that the provision that plaintiff should "receive 5 per cent. of all future business in return for his technical assistance and services" means that the relation provided for by the contract should continue so long as defendant should continue in the business of making and selling high-temperature heat-resisting alloys. We are unable to agree with this contention. Assuming, for the purposes only of this opinion, but without so deciding, that a contract to that effect would not, in view of partial performance thereof, be void for lack of mutuality, and conceding that unless for such lack the agreement would be valid, we think the natural meaning of the words used is not as plaintiff contends, but is rather "5 per cent. of all business while the relation provided by this contract shall continue." This otherwise natural conclusion is corroborated by the words "in return for his technical assistance and services." If the parties meant to agree that plaintiff should continue to receive the commissions so long as defendant should continue in the business in respect to which plaintiff was being employed, it would have been quite the natural way to say so in express terms. We think it not open to the contention that plaintiff contracted, either expressly or by natural implication, to work with defendant so long as the latter should continue to make and sell high-temperature heat-resisting alloys. It seems, indeed, to be conceded that plaintiff was not obligated to continue in de-

fendant's employ at least after the contemplated business was "built up," etc. It is not alleged that such situation had not been reached when plaintiff was discharged. Again, if plaintiff's construction of the phrase in question is correct, it would seem to follow that plaintiff might continue to draw the commissions and at the same time carry on a like business on his own account, or even through or in assistance of another manufacturer than defendant.

Nor, in what is said in the petition of the preparation by defendant, the next day after the contract in suit was executed, of a proposed substituted contract containing not only a limitation of ten years' duration of the proposed substituted contract, but certain other provisions which did not meet with the approval or acceptance of the plaintiff, and was accordingly not accepted by him, do we find any substantial basis for the contention that neither party intended that the contract which had already been agreed upon and executed, and here in suit, was terminable at the option of either party. The case involves no seriously controverted legal propositions. It turns at the last upon the meaning of the single clause "all future business," interpreted by its language and context and in the light of the circumstances under which the contract was made. It may be that plaintiff has not been generously dealt with, but we are constrained to think that he has stated no case entitling him to recover.

The judgment of the District Court is affirmed.